**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF**
**ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER LEGG and PAGE LOZANO, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | Case No. 1:14-cv-10043 |
| Plaintiffs, | ) | |
| | ) | Judge Robert Gettleman |
| v. | ) | |
| | ) | Magistrate Judge Young B. Kim |
| PTZ INSURANCE AGENCY, LTD. an Illinois Corporation, and PETHEALTH, INC., a Canadian Corporation, and FAIRFAX FINANCIAL HOLDINGS LTD., a Canadian Corporation, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

**<u>INTRODUCTION</u>**

1.      Plaintiffs Christopher Legg and Page Lozano bring this class action for damages, and other legal and equitable remedies, against Defendants Pethealth, Inc. ("Pethealth"), its wholly-owned subsidiary, PTZ Insurance Agency, Ltd. ("PTZ"), and Pethealth's parent Fairfax Financial Holdings Limited ("Fairfax"), which acquired Pethealth in an all stock acquisition on November 14, 2014, to secure redress for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

2.      Plaintiffs bring their class claims pursuant to the TCPA, 47 U.S.C. § 227(b), and the associated Federal Communications Commission ("FCC") Regulations, 47 C.F.R. § 64.1200(a), for unsolicited telemarketing and advertising calls made to the cell phones of Plaintiffs

and others using an artificial or prerecorded voice without the prior express consent of the called parties and without the prior express signed written consent of the called parties.

3.      "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA. Congress determined that federal legislation was needed because telemarketers, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) ("In enacting the TCPA, …"Congress reported, [m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls") (citing Congressional Findings).  In an effort to enforce this fundamental right to privacy, Plaintiffs file the instant class action complaint alleging violations of the TCPA.

4.      Defendants violated the TCPA by robocalling the cellphones of individuals who adopted pets from other entities such as animal shelters. The robocalls "included" and "introduced" an "advertisement", as prohibited by 47 C.F.R. § 64.1200(a)(2), because they (1) promoted Defendants' insurance products by providing an introductory 30-day gift offer; (2) promoted additional comprehensive insurance coverage that Defendants' ███ agent pitched to anyone who pressed "1" during the call or called the toll free number promoted in the call; and (3) asked the call recipients to open emails that expressly advertised Defendant's comprehensive insurance coverage.  The advertising nature of the calls is also shown in Defendants' own materials which described the 30-day gift offer as "advertisement" and Defendants' arrangements with adoption agencies ███████████████████████████████████████████ ██████████████████████████████.

5.      The robocalls also constituted telemarketing because their context and purpose was to promote Defendants' pet insurance products by offering 30-days of free, limited coverage pet

insurance so that the recipients would sign-up for longer-term, comprehensive coverage. Defendants routinely referred to their 30-day gift program as "marketing" and the robocall messages instructing class members to speak to someone in their ███████████ or review emails that provide discounts to comprehensive coverage confirms that conclusion. Plaintiffs and the putative class members never signed any documents that informed them that their telephone numbers would be used by Defendants or that Defendants would be robocalling them about promotional offers for their pet health insurance.

6. Defendants, in contravention of the TCPA, have caused concrete and particularized injury upon Plaintiffs by placing several calls to them during the time frame relevant to this action (October 16, 2013 to the present), not only because they and putative class members were subjected to the aggravation that necessarily accompanies these calls, but also because consumers frequently have to pay their cell phone service providers for the receipt of such calls and such calls violated Plaintiffs' and the putative classes' substantive rights under the TCPA, invaded their privacy, trespassed upon and occupied their cellular telephone lines, were an intrusion upon seclusion, diminished cellular battery life, and wasted their time.

7. As more fully set out below, Plaintiffs bring three counts under the TCPA and three separate putative classes corresponding to those counts for (1) a prerecorded advertising class; (2) a prerecorded telemarketing class[1]; and, alternatively (3) a prerecorded non-consent class.. The robocall messages were all substantively the same and fit either of the TCPA's advertising or

---

[1] Plaintiffs replead their claim that Defendants' robocalls were "telemarketing" calls under the TCPA solely to preserve their right to appeal this Court's September 21, 2016 and November 21, 2016 decisions, which respectively denied Plaintiffs motion for class certification of a telemarketing TCPA claim and denied Plaintiffs' motion for reconsideration of that denial. Defendants do not need to answer this Count.

marketing prong.  47 CFR 64.1200(f)(1) & (12).  The Class Period for all three counts and classes

begins on October 16, 2013 to the present.

## JURISDICTION AND VENUE

8.     The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §

1331. *Mims*, 565U.S. at 376. The Court further has subject matter jurisdiction over this action

pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because (i) at least one

member of the putative class is a citizen of a state different from Defendants, (ii) the amount in

controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions

under that section apply to this action.

9.     This Court has personal jurisdiction over Defendant PTZ because it is

headquartered and does business in this District. *See*, 28 U.S.C. § 1391(c)(2).  Additionally,

Defendant has admitted that this Court has personal jurisdiction over it in answering and filing

amended answers to Plaintiffs' prior complaints.

10.     This Court has personal jurisdiction over Defendant Pethealth because it has

entered into contracts, owns property and does business in this District, and was engaged in the

misconduct alleged in this case which was directed at residents of this District. *See*, *Id*.

Additionally, on several occasions Pethealth admitted this Court had personal jurisdiction over it

in answering and filing amended answers to Plaintiffs' prior complaints.

11.     This Court has personal jurisdiction over Defendant Fairfax because it has entered

into contracts, owns property and does business in this District, and owns companies which are

incorporated in this State and have headquarters or offices in this District.  Fairfax also exerts

extraordinary control over its subsidiaries, including Pethealth, by providing (and deciding

whether to provide) the capital necessary to operate the business.  Fairfax has funded Pethealth's

operations during the class period and chose to allow Pethealth to continue engaging in the TCPA violations alleged in this complaint, which Fairfax benefitted from. Fairfax consolidates the financial statements of Pethealth and PTZ into its financial statements. Fairfax also was directly or indirectly engaged in the misconduct alleged in this case which was directed at residents of this District. *See*, *Id.*

12.     Thus, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

13.     Plaintiff Christopher Legg is a natural person and resident of Broward County, Florida. At all relevant times Mr. Legg was the subscriber and sole user of the cellular telephone at issue.

14.     Plaintiff Page Lozano is a natural person and resident of San Antonio, Texas. At all relevant times Mrs. Lozano was the sole user of the cellular telephone at issue.

15.     Defendant PTZ is a for-profit Illinois corporation and a wholly-owned subsidiary of Pethealth, with its principal place of business at 3315 Algonquin Road, Suite 450, Rolling Meadows, IL 60008.

16.     PTZ was directly involved in the robocalls sent in this case as they were sent using the personnel and resources of, and representations made by, PTZ. PTZ administers the insurance operations that were the subject of the robocalls for Pethealth.

17.     Defendant Pethealth is a for-profit Canadian corporation and parent company to Defendant PTZ.

18.     Pethealth had and exerted control over the finances and operations of PTZ, and was directly involved in the robocalls sent in this case as Pethealth personnel and resources were used, and it made representations to class members regarding the robocalls. Pethealth also consolidated

5

PTZ's financial statements into its financial statements prior to its acquisition by Fairfax, and thereafter consolidated its and PTZ's financial statements into Fairfax's. Alternatively, Pethealth is vicariously liable for PTZ's misconduct and involvement in the robocalls as PTZ acted as the agent of Pethealth as PTZ used 24PetWatch in distributing and administering the 30-day gift offer program through robocalls while ███████████████████████████████████ ████████████. Pethealth consistently ratified the conduct of PTZ throughout the class period by continuing to financially benefit from such conduct and by furthering the sending of illegal robocalls through its actions. On November 14, 2014, after the start of the class period of October 16, 2013, Pethealth was acquired by Fairfax Financial Holdings Limited in an all stock acquisition.

19.     Defendant Fairfax Financial Holdings Limited is a Canadian corporation and parent company to Defendant Pethealth, which operates a variety of insurance businesses.  On November 14, 2014, Fairfax acquired 100% of Pethealth, Inc.'s common and preferred stock for $100 million (Canadian) and became the owner and controlling shareholder of 100% of Pethealth's shares.

20.     Fairfax had and exerted financial and operational control over Pethealth and PTZ.

21.     As set forth below, Fairfax is directly and/or indirectly liable as the entity in complete control of Pethealth's and PTZ's operations at the time of its acquisition of Pethealth and thereafter.  Shortly after the acquisition, Fairfax represented that Pethealth was "a Fairfax Company," including on Pethealth's website pages which promoted the "gift" of insurance offer.

22.     Fairfax is also subject to vicarious liability as Pethealth and PTZ were Fairfax's agents and Fairfax ratified the conduct of Pethealth and PTZ, and benefitted from such conduct.

23.      Fairfax is also liable as the acquirer of and successor to Pethealth's assets and liabilities (including but not limited to accrued, undisclosed and contingent liabilities) as a result

of its all stock acquisition of Pethealth, Inc., in the event Pethealth and/or PTZ are unable to satisfy a judgment in this case.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. § 227

24.     In 1991 Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing practices.

25.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.

26.     After October 16, 2013, the FCC required that Defendants obtain prior signed written express consent to place telemarketing calls to cellular telephone numbers. *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1831, 1835 (2012).

27.     The FCC's rules define "prior express written consent" as:

"an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."

47 C.F.R. § 64.1200(f)(8).

28.     The FCC's rules further require that

"(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services."

*Id.*

## FACTS

### A. **Defendants' Business Operations**

29.     Pethealth sells database management services to pet adoption agencies and uses the agencies to promote Pethealth's and PTZ's pet-related products and services to sell to adopters, including pet health insurance. Defendants use "an in-house call center and sales force" to promote their products and services to adopters.

30.     Pethealth's PetPoint Data Management System ("Petpoint DMS") provides adoption agencies with equipment, software and support to manage "animal intake/outcome tracking, medical protocols and procedures, and basic care activity…"

31.     Pethealth charges adoption agencies a fee for using this system based on the number of adoption intakes the agency completes each year. "The price [of the fee] can be 100% discounted" if the adoption agency "participat[es] in [Defendants'] 24PetWatch Insurance Program, 24PetWatch Microchip Program, and the Petango Adoption Network." ███████

████████████████████████████████████████████████████████████

███████

32.     ███████████████████████████████████████████████████████

███, which it uses to promote its lost pet recovery services through microchip implant monitoring and its pet health insurance products.

33.     Pethealth stores the adopter's contact information it receives from the shelters in its 24PetWatch databases.  Pethealth and PTZ "leverage" their "databases" to "increase … [their] business-to-consumer revenues" by "facilitat[ing] timely and personalized marketing messages to pet adopters from the point of adoption."

34.     One such way Defendants' leveraged their databases was with their pet insurance products, which it also promotes  through its 24PetWatch brand name.  Pethealth's insurance products are provided by its 24PetWatch Pet Protection services, a leading provider of pet insurance in North America, which "offers the 24PetWatch Gift of Insurance program (formerly, Shelter Care ®), providing adopters with up to 45 days of complimentary pet insurance."  PTZ uses the 24PetWatch name to distribute and administer Pethealth's pet insurance program.

35.     Adoption agencies are provided "[s]eamless integration [of the Petpoint DMS database] with [Pethealth's] 24PetWatch Insurance and Microchip programs, and data collection]".

**B.**     ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████

36.     Defendants provide adoption agencies with flyers, brochures, posters and other materials which promote Defendants' 24PetWatch Gift of Insurance.  ████████████████████
█████████████████████████████████████ for Defendants' insurance products.

37.     For example, ██████████████████████████████████████████████████
████████████████████

38.     Defendants also described the gift of insurance as a limited coverage policy, which covered only certain types of pet health issues, and advertised the 30-day gift for the purpose of obtaining new customers and to sell them more comprehensive insurance policies.

39. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

40.     Pethealth's CFO stated in its 2013 Annual Report that it was accelerating "funding of [its] 24PetWatch Gift of Insurance program" and Pethealth's CEO stated he believed that "[s]helter clinics will give [Pethealth Inc.] the opportunity to sell more pet insurance."

41.     Defendants used a massive advertising campaign that consisted of e-mails and robocalls in conjunction with their other materials and processes to advertise and sell their insurance products.

42.     The initial robocall, which all class members received, expressly asks the recipient to ████████████████████████████████████████████ ███████████████████████ Specifically, the initial robocall (which Defendants refer to as the ████████ ) stated:

███████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████

43.     The 24PetWatch ████████████████ state:

Dear [Christopher Legg],

You only have 24 hours left to confirm your
24PetWatch 30-Day Gift of Insurance.
Click here to confirm your gift now before
this offer expires.

Don't forget that *new adopters are also
eligible for an $8.95 credit towards one of our
comprehensive insurance policies; please call
one of our agents at 1-877-291-1524*
to find out about this upgrade today!

Get the coverage you both deserve. Protect
yourself, [Woodstock] and your wallet.
Confirm your 24PetWatch Gift of Insurance
now!

Sincerely,
Your 24PetWatch Pet Insurance Team

Dear [Christopher Legg],

Are you really prepared for the unexpected
cost of life saving veterinary care?
Act now! Protect [Woodstock] and take
advantage of our limited time offer. *Receive
an $8.95 credit towards your first month's
premium with one of our comprehensive
accident and illness policies.*

Don't wait, *call now to protect your pet and
your wallet with this special 24PetWatch
Pet Insurance Offer. Simply call us at 1-877-
291-1524 and speak with a
representative that can apply your $8.95
credit towards the best policy fit for
Woodstock.*

Don't delay, call us today!

Sincerely,
Your 24PetWatch Pet Insurance Team

44.     Defendants admit that they then sent a so-called ██████████ which stated:

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

45.     ███████████████████████████████████████████████████

████████████████████████████████. In accordance with Defendants' advertising materials,

including the emails sent to class members, Defendants' sales staff would then attempt to sell class

members on more comprehensive insurance coverage.

46.     If a person called the 877 number contained in the e-mail or Day 6 prerecorded

calls, the call went to the ███ agents attempting to ████████████████.

47.  Class members who registered for the "gift" received follow-up emails from Defendants confirming that the purpose of the robocalls was to advertise and sell Defendants' comprehensive insurance products.  Plaintiff Lozano received two such emails on August 3 and September 26, 2014, which offered a 15-day extension to the "30-day Gift of Insurance" or an $8.95 credit towards any one of our comprehensive core policies".

48.  Because of Defendants' use of a massive, unsolicited robocall campaign, numerous class members posted complaints on-line regarding receipt of such calls.



**D.  Defendants Did Not Obtain Prior Express Signed Written Consent To Make Advertising Or Marketing Robocalls To Plaintiffs' And Class Members' Cellular Telephones**

52.  Defendants did not seek or obtain signed written consent from Plaintiffs or class members to allow Defendants to robocall their cellular telephone numbers to advertise or market their 30-day gift of insurance and their comprehensive insurance products.

53.

54.     Plaintiffs and class members did not sign papers with Defendants prior to receiving the robocalls.  Plaintiffs also did not initiate contact with Defendants. Instead, Plaintiffs limited contact to at most ***email or mail*** communications from the adoption agencies, and did not expressly consent to contacts from Defendants.

**E. Defendants' Robocalls Are Subject To The TCPA's Advertising And Telemarketing Requirements, And The FCC's Dual Purpose Standard**

55.     As demonstrated herein, the robocalls Defendants sent class members "include or introduce an advertisement", as prohibited by 47 CFR § 64.1200(a)(2), and "constitute telemarketing", as prohibited by 47 CFR § 64.1200(a)(2).  Plaintiffs therefore have pled separate counts (Counts I and II, respectively) against Defendants for violations of the TCPA's advertising requirement and telemarketing requirement.

56.     Under either of those prongs, Defendants were required to obtain prior express written consent to send robocalls to class members, which they did not do.  47 C.F.R. 64.1200(f)(8).

57.     Additionally, the robocalls meet the Federal Communication Commission's "dual purpose" standard, which provides that "if the call, notwithstanding its free offer or other information, is intended to offer property, goods, or services for sale either during the call, **or in the future**, that call is an advertisement."  18 FCC Rcd. 14014, 14098 at ¶142 (July 3, 2003)(Emphasis added). ███████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████

**F. Defendants Did Not Obtain Prior Express Consent To Make Any Robocalls To Plaintiffs' And Class Members' Cellular Telephones**

58.　　Defendants did not seek or obtain consent from Plaintiffs or class members to allow Defendants to robocall their cellular telephone numbers about their 30-day gift of insurance or their comprehensive insurance products.

59.　　Defendants only required that an adopter provide an email address and that their pet be microchipped to be eligible for the 30-day gift offer.

60.　　Plaintiffs and class members did not sign papers with Defendants prior to receiving the robocalls. Plaintiffs also did not initiate contact with Defendants. Instead, Plaintiffs limited contact to at most *email or mail* communications from the adoption agencies, and did not expressly consent to contacts from Defendants.

61.　　Defendants or their agents placed two or more advertising or telemarketing calls in a 12 month period to consumers who have registered their telephone numbers on the National Do Not Call Registry.

## FACTS RELATING TO PLAINTIFFS

62.　　On or about November 8, 2014, Mr. Legg adopted a kitten, "Woodstock", from the Florida Humane Society.

63.　　As a part of the adoption a microchip was placed in Woodstock and registered with "24PetWatch".

64.　　Subsequently, Mr. Legg received at least three calls to his cellular telephone from the phone number 877-291-1524 ("the 1524 number").

65.　　The 1524 number is listed in 24PetWatch's promotional materials.

66.     One of the calls Mr. Legg received was a prerecorded message on his cellular telephone's voice message service from the 1524 number. The message states:

> *...877-291-1524. ...Are you still there? ... Hello, we're calling from Playful PetWatch Pet Insurance to remind you that when you adopted your pet you were given a thirty (30) day gift of insurance and you only have one (1) day left to activate it. Protect your pet from the unexpected and press "1" now to activate your gift or call 1-877-291-1524.*

67.     Mr. Legg did not provide Defendants with permission to place such advertising and marketing phone calls to his cellular telephone.

68.     At the time Mr. Legg adopted Woodstock, Mr. Legg provided instructions that limited any contact to receiving mail or email communications.  Mr. Legg did not receive any papers or sign any papers stating that he would receive communications from Defendants or that Defendants would contact him on his cellular telephone, or that Defendants would robocall him to register for their 30-day gift of insurance.

69.     Mr. Legg's cellular telephone is listed on the National Do Not Call Directory.

70.     Mr. Legg was damaged by Defendants' calls. His privacy was wrongfully invaded, and Plaintiff has become understandably aggravated with having to deal with the frustration of repeated, unwanted phone calls forcing him to divert attention away from his work and other activities.

71.     On or about August 2, 2014, Mrs. Lozano adopted a dog, "Kevin," from San Antonio Pets Alive.

72.     Subsequently, Mrs. Lozano received several prerecorded calls soliciting her to activate insurance for her pet.

73.     Mrs. Lozano did not provide Defendants with permission to place such advertising and marketing phone calls to her cellular telephone.

74.     At the time Mrs. Lozano adopted her pet, the paperwork provided to Mrs. Lozano provided instructions to limit any communication to e-mails. Mrs. Lozano did not receive any papers or sign any papers stating that she would receive communications from Defendants or that Defendants would contact her on her cellular telephone, or that Defendants would robocall her to register for their 30-day gift of insurance.

75.     Mrs. Lozano's cellular telephone is listed on the National Do Not Call Directory.

76.     Mrs. Lozano was damaged by Defendants' calls. Her privacy was wrongfully invaded, and she has become understandably aggravated with having to deal with the frustration of repeated, unwanted phone calls forcing her to divert attention away from other activities.

## FACTS RELATED TO PETHEALTH'S LIABILITY

77.     Pethealth had and exercised control over the operations of PTZ, the distributor and administrator of the 30-day gift program, in furthering the 30-day offer to class members.

78.     ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

79.     ███████████████████████████████████████████
██

80. 

81.

82.     Pethealth is directly liable for its involvement in furthering Defendants' robocall process throughout the class period.

83.     Alternatively, Pethealth is also vicariously liable for PTZ's misconduct surrounding the robocalls, as PTZ acted as Pethealth's agent, Pethealth knew about the misconduct, Pethealth ratified the misconduct and Pethealth directly benefitted from PTZ's misconduct.

## FACTS RELATED TO FAIRFAX'S LIABILITY

84.     In mid-2014, Fairfax established the entity "8653291 Canada Inc." as a wholly-owned subsidiary of Fairfax for the sole purpose of acquiring all the shares of Pethealth, Inc.

85.     Prior to acquiring Pethealth, Fairfax completed extensive due diligence into Pethealth operations, including reviewing its promotions, advertising, marketing and sales campaigns, and the methods Pethealth used in making product or service offers.

86.     During its due diligence, Fairfax became aware, or should have been aware, of Pethealth's and PTZ's use of robocalls offering the free 30-day gift of insurance and that the calls were made to recipients without having obtained prior express written consent or even prior express consent.

87.     Despite having this knowledge, Fairfax purchased all of Pethealth, Inc.'s stock without disclaiming liability for any of Pethealth Inc.'s then current or prior actions, and without excluding liability for Pethealth Inc.'s accrued, undisclosed or contingent liabilities.

88.     On November 14, 2014, Fairfax acquired all the outstanding common and preferred shares of Pethealth, Inc. for $100 million (Canadian $).  Fairfax guaranteed the purchase amount to avoid having the transaction subject to a financing condition, and represented that it had sufficient funds to complete the purchase.

89.     Upon acquiring Pethealth, Inc. on November 14, 2014, Fairfax controlled and continues to control Pethealth, Inc.'s operations.  Pethealth Inc. no longer exists as an independent publicly traded company, was de-listed from the Toronto Stock Exchange and ceased to be a reporting company.

90.     Fairfax acquired further knowledge of Pethealth's and PTZ's robocalling misconduct when Plaintiff Legg filed this case on December_15, 2014.

91.     Fairfax, given its control of Pethealth's and PTZ's operations, had (and has) the ability to make changes to how Pethealth and PTZ promoted their 30-day gift of insurance offer.

92.      Rather than terminate the robocall program or change the program to require that Pethealth and PTZ only call those who have provided the necessary prior consent, Fairfax allowed the program to continue, which is still ongoing.

93.     Fairfax has financially benefitted from the revenues and profits generated from that program.

94.     Fairfax is liable for its knowledge and control of, and involvement with, the operations that caused the robocalls to occur.  Fairfax is also liable as the acquiror of and successor

to the assets and liabilities of Pethealth Inc. in the event Pethealth Inc., PTZ or their subsidiaries and affiliated entities are unable to satisfy a judgment in this case.

## COUNT I
### Violations of the TCPA, 47 U.S.C. § 227(b)
### (On Behalf of Plaintiff and the Class for Defendants' Advertising Robocalls)

95.     Plaintiffs re-allege and incorporates the foregoing allegations as if fully set forth herein.

96.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

97.     The level of consent necessary for a person to send an artificial or prerecorded voice call that "includes or introduces an advertisement" is signed prior express written consent. 47 C.F.R. 64.1200(a)(2).

98.     Advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services."  47 C.F.R. 64.1200(f)(1).

99.     The robocalls at issue here included or introduced an advertisement because they (1) promoted Defendants' insurance products by providing an introductory 30-day gift offer; (2) promoted additional comprehensive insurance coverage that Defendants' ▮▮▮ agent pitched to anyone who pressed  "1" during the call or called the toll free number promoted in the call; and (3) asked the call recipients to open emails that expressly advertised Defendant's comprehensive insurance coverage.

100.     Defendants, or their agent(s), made the artificial or prerecorded advertising calls to the cellular telephones of Plaintiffs and the other members of the Classes defined below.

19

101.    These calls were made without regard to whether or not Defendants had first obtained prior express written permission from the called party to make such calls. In fact, Defendants did not even have prior express consent to call the cell phones of Plaintiffs and the other members of the § 227(b) putative Class when the calls were made.

102.    Defendant has, therefore, violated § 227(b)(1)(A)(iii) of the TCPA, and § 64.1200(a)(2) of the FCC's rules, by making artificial or prerecorded non-emergency advertising telephone calls to the cell phones of Plaintiffs and the other members of the putative Class after October 16, 2013, without their written prior express permission.

103.    Defendants knew that they did not have signed prior express written consent, let alone prior express consent, to make these calls. The violations were therefore willful or knowing.

104.    As a result of Defendants' conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiffs and the other members of the putative Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiffs and the class are also entitled to an injunction against future calls.

105.    Because Defendants knew or should have known that Plaintiffs and the other members of the putative Class had not given signed prior express written consent to receive artificial or prerecorded voice advertising calls to their cellular telephones – and/or willfully made artificial or prerecorded voice messages to call the cell phones of Plaintiff and the other members of the Class without prior express written consent – the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the TCPA.

## COUNT II
### Violations of the TCPA, 47 U.S.C. § 227(b)
### (On Behalf of Plaintiff and the Class for Defendants' Telemarketing Robocalls)[2]

106.     Plaintiffs re-allege and incorporates the foregoing allegations as if fully set forth herein.

107.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

108.     The level of consent necessary for a person to send artificial or prerecorded voice calls that "constitute telemarketing" is signed prior express written consent. 64.1200(a)(2).

109.     Telemarketing is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. 64.1200(f)(12).

110.     The robocalls at issue here marketed the purchase of Defendants' pet insurance products.  The robocalls encouraged call recipients to try Defendants' free 30-day gift of limited insurance so that they would be more likely to purchase a more comprehensive policy.  The robocall references to connecting with ███ agents by pressing "1" and to emails they would receive from Defendants were referring to further attempts by Defendants to sell the call recipient on a more comprehensive insurance policy.

---

[2]     Plaintiffs replead their claim that Defendants' robocalls were "telemarketing" calls under the TCPA solely to preserve their right to appeal this Court's September 21, 2016 and November 21, 2016 decisions, which respectively denied Plaintiffs motion for class certification of a telemarketing TCPA claim and denied Plaintiffs' motion for reconsideration of that denial. Defendants need not answer this Count.

111. Defendants, or their agent(s), made artificial or prerecorded telemarketing calls to the cellular telephones of Plaintiffs and the other members of the Class defined below.

112. These calls were made without regard to whether or not Defendants had first obtained signed prior express written permission from the called party to make such calls. In fact, Defendants did not even have prior express consent to call the cell phones of Plaintiffs and the other members of the § 227(b) putative Class when the calls were made.

113. Defendant has, therefore, violated § 227(b)(1)(A)(iii) of the TCPA by making artificial or prerecorded non-emergency telemarketing telephone calls to the cell phones of Plaintiffs and the other members of the putative Class after October 16, 2013, without their written prior express permission.

114. Defendants knew that they did not have prior express written consent, let alone prior express consent, to make these calls. The violations were therefore willful or knowing.

115. As a result of Defendants' conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiffs and the other members of the putative Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiffs and the class are also entitled to an injunction against future calls.

116. Because Defendants knew or should have known that Plaintiffs and the other members of the putative Class had not given prior express written consent to receive artificial or prerecorded voice telemarketing calls to their cellular telephones – and/or willfully made artificial or prerecorded voice messages to call the cell phones of Plaintiff and the other members of the Class without prior express written consent – the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the TCPA.

## COUNT III
### Violations of the TCPA, 47 U.S.C. § 227(b)
### (On Behalf of Plaintiff and the Class for Defendants' Robocalls)

117.    Plaintiffs re-allege and incorporates the foregoing allegations as if fully set forth herein.

118.    It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

119.    The level of consent necessary for a person to send artificial or prerecorded that are not advertising or marketing calls is "prior express consent."

120.    The robocalls at issue here, even if not deemed to be advertising or marketing, were unsolicited calls to class members who adopted pets and who had no knowledge or notice that in signing the adoption papers that they would be subject to robocalls about pet insurance.

121.    Defendants, or their agent(s), made artificial or prerecorded calls to the cellular telephones of Plaintiffs and the other members of the Class defined below.

122.    These calls were made without regard to whether or not Defendants had first obtained prior express permission from the called party to make such calls. In fact, Defendants did not have prior express consent to call the cell phones of Plaintiffs and the other members of the § 227(b) putative Class when the calls were made.

123.    Defendant has, therefore, violated § 227(b)(1)(A)(iii) of the TCPA by making artificial or prerecorded non-emergency telephone calls to the cell phones of Plaintiffs and the other members of the putative Class after October 16, 2013, without their prior express permission.

124.    Defendants knew that they did not have prior express consent to make these calls. The violations were therefore willful or knowing.

125.     As a result of Defendants' conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiffs and the other members of the putative Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiffs and the class are also entitled to an injunction against future calls.

126.     Because Defendants knew or should have known that Plaintiffs and the other members of the putative Class had not given prior express consent to receive artificial or prerecorded voice calls to their cellular telephones – and/or willfully made artificial or prerecorded voice messages to call the cell phones of Plaintiff and the other members of the Class without prior express consent – the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the TCPA.

## CLASS ALLEGATIONS

127.     Plaintiffs bring this case on behalf of three Classes defined as follows, subject to amendment as appropriate:

### § 227(b) Class – for Defendants Sending Advertising Robocalls

*(1) All persons in the United States (2) who Defendants or some person on Defendants' behalf (3) called on their cell phone using an artificial or prerecorded voice message to play Defendants' Day 2 or Day 6 message (4) where the person did not provide signed express written consent to receive automated prerecorded calls (5) in the period between October 16, 2013 to the present.*

### § 227(b) Class – for Defendants Sending Telemarketing Robocalls

*(1) All persons in the United States (2) who Defendants or some person on Defendants' behalf (3) called on their cell phone using an artificial or prerecorded voice message to play Defendants' Day 2 or Day 6 message (4) where the person did not provide signed express written consent to receive automated prerecorded calls (5) in the period between October 16, 2013 to the present.*

### § 227(b) Class – for Defendants Sending Robocalls

*(1) All persons in the United States (2) who Defendants or some person on Defendants' behalf (3) called on their cell phone using an artificial or prerecorded voice message to play Defendants' Day 2 or Day 6 message (4) where the recipient did not give prior express consent to Defendants to receive automated calls (5) in the period between October 16, 2013 to the present.*

128.    Defendants' records ███████████████████████████████

██████████████████████████████.

129.    Common questions of law or fact exist as to all members of the putative Classes and predominate over any question solely affecting any individual member, including Plaintiffs. Such questions common to the Classes include but are not limited to:

a.      Whether Defendants used "artificial or prerecorded voice" calls as such terms are defined or understood under the TCPA and applicable FCC regulations and orders;

b.      Whether Defendants had prior express written permission to contact Plaintiff and the other members of the putative Classes when they made calls to their cell phones using an artificial or prerecorded voice;

c.      Whether the calls Defendants made constitute advertising calls;

d.      Whether the calls Defendants made constitute telemarketing calls;

e.      The amount of damages, including whether Defendants' violations were performed willfully or knowingly such that Plaintiffs and the members of the putative Classes are entitled to trebled damages; and

f.      Whether Defendants are directly, jointly or vicariously liable for the calls at issue.

130.    Plaintiffs' claims are typical of the claims of the other members of the putative Classes. The factual and legal bases of Defendants' liability to Plaintiffs and the other members of the putative Classes are the same: Defendants violated the TCPA by causing the cellular telephone

number of each member of the putative Classes, including Plaintiffs, to be called using a prerecorded voice message without prior express written permission or even prior express permission.

131. Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have no interests that might conflict with the interests of the Classes. Plaintiffs are interested in pursuing their claims vigorously, and has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

132. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. There are thousands of members of the putative Classes, such that joinder of all members is impracticable.

133. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

134. Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Classes as a whole. Prosecution of separate actions by individual members of the putative Classes, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct.

135.    The identity of the Classes has been identified from the records of Defendants, which only need to be supplemented to provide records for the entire class period.

WHEREFORE, Plaintiffs on behalf of themselves and the other members of the Classes, prays for the following relief:

a.    A declaration that Defendants' practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b.    An injunction prohibiting Defendants from using an artificial or prerecorded voice message to call numbers assigned to cellular telephones without the prior express written permission of the called party;

c.    An injunction prohibiting Defendants from using an artificial or prerecorded voice message to call numbers assigned to cellular telephones without the prior express permission of the called party;

d.    An award of actual damages;

e.    An award of statutory damages for Plaintiffs and each Class member in the amount of $500.00 for each and every call that violated the TCPA;

f.    An award of treble damages, as provided by statute, of up to $1,500.00 for Plaintiffs and each Class member for each and every call that violated the TCPA;

g.    An order certifying this action to be a proper class action pursuant to the Federal Rules of Civil Procedure 23, establishing the appropriate Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Classes; and

h.    Such further and other relief the Court deems reasonable and just.

Dated: December 12, 2016

Respectfully submitted,

By: */s/ Keith J. Keogh*
Keith J. Keogh
One of Plaintiffs' attorneys

| | |
|---|---|
| Keith J. Keogh | Scott D. Owens* |
| Michael R. Karnuth | scott@scottdowens.com |
| Timothy Sostrin | Patrick C. Crotty* |
| Michael Hilicki | patrick@scottdowens.com |
| Keogh Law, Ltd. | SCOTT D. OWENS, P.A. |
| 55 W. Monroe St., Ste, 3390 | 3800 S. Ocean Drive, Ste. 235 |
| Chicago, IL 60603 | Hollywood, FL 33019 |
| Tel:     (312) 726-1092 | Telephone: (954) 589-0588 |
| Fax:     (312) 726-1093 | Facsimile: (954) 337-0666 |
| Keith@Keoghlaw.com | * pro hac vice |

## JURY DEMAND

Plaintiffs demand trial by jury.

By: */s/ Keith J. Keogh*

## DOCUMENT PRESERVATION DEMAND

Plaintiffs hereby demand that Defendants place a formal litigation hold as to any documents or data relating to the allegations in this case. Specifically, and without limitation, Plaintiffs request that all advertising and marketing call records, documents and data that might bear on prior express consent, prior express signed written consent, or any other defense, all documents and communications regarding use of any type of instrumentality, hardware, software or hosted telephone dialer communications between the parties regarding advertising or marketing by phone, contracts and agreements between the parties, documentation regarding marketing "leads", calls made to those leads and whether (and to whom) sales were made be preserved.  This list is non-exhaustive.

28